# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### July 2004 Session

## STATE OF TENNESSEE v.  DAVID IVY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 01-12388  Joseph B. Dailey, Judge**

---

**No. W2003-00786-CCA-R3-DD  - Filed December 30, 2004**

---

The Appellant, David Ivy, appeals as of right his sentence of death resulting from the  June 2001 murder of Lakisha Thomas.  On January 10, 2003, a Shelby County jury found Ivy guilty of premeditated first-degree murder.  Following a separate sentencing hearing, the jury unanimously found the presence of two statutory aggravating circumstances, *i.e.*, Ivy had previously been convicted of a violent felony offense and the murder was committed to avoid prosecution.  The jury further determined that these aggravating circumstances outweighed any mitigating circumstances and imposed a sentence of death.  The trial court approved the sentencing verdict.  Ivy appeals, as of right, presenting for our review the following issues: (1) whether the evidence was sufficient to establish his identity as the perpetrator, (2) whether the trial court improperly permitted hearsay statements of the victim to be admitted into evidence, (3) whether the trial court erred by impaneling an anonymous jury, (4) whether the trial court erred in refusing to permit the defense, during closing argument, to discuss the rationale behind the hearsay exclusion, (5) whether the trial court erred by preventing defense counsel from arguing "residual doubt" as a non-statutory mitigating circumstance, (6) whether the trial court erred by permitting the State to introduce evidence that Ivy had previously been charged with first degree murder, (7) whether the trial court's instruction that Ivy's prior offenses were offenses whose statutory elements involved the use of violence violated his right to trial by jury, (8) whether the death penalty imposed in this case violated due process because the indictment failed to allege the aggravators relied upon by the State, (9) whether the trial court erred in refusing to answer the jury's questions as to the consequences if they were unable to reach an unanimous verdict as to punishment, and (10) whether Tennessee's death penalty statutory scheme is unconstitutional.  Finding no error requiring reversal, we affirm Ivy's conviction and sentence of death.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and, ALAN E. GLENN, J., joined.

W. Mark Ward, Tony N. Brayton, Garland Erguden, Memphis, Tennessee, for the Appellant, David Ivy.

Paul G. Summers, Attorney General and Reporter; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General, and Amy Weirich, Assistant District Attorney General, and Gerald Harris, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

*Guilt Phase Evidence*

In June 2001, Memphis Police Officer Steve Cummings was assigned as a patrol officer in the south precinct. On the morning of June 6th, Officer Cummings responded to an assault call at an apartment complex located at the 3700 block of Millbranch. Upon arriving at the apartment complex, the complainant, Lakisha Thomas, reported that she had been assaulted. Ms. Thomas informed the officer that "her ex-boyfriend, [David Ivy], had assaulted her in the area of Park and Airways with a black Uzi type pistol with a long magazine." She told Officer Cummings that David Ivy was also known as "Day Day." Indeed, Ms. Thomas had "Day Day" tattooed on the right side of her neck. Ms. Thomas advised Officer Cummings that Appellant Ivy had "said that he wasn't going back to jail" and "that he would come back and kill her." Officer Cummings described Ms. Thomas as being "visibly upset. Upset at what had happened earlier in the day and upset with what might occur in the future."

Upon a visual examination of the victim, Officer Cummings observed that Ms. Thomas "had about a two-inch laceration to the top of her head. She had some bruising just above her left chest above her left breast. And she had a right black eye on the right side of her face." Officer Cummings photographed the victim's injuries. Although paramedics were called to the scene, Ms. Thomas refused treatment and stated that "she would seek medical attention via her own means."[1] A warrant charging Appellant David Ivy with aggravated assault was issued on June 7, 2001. Although the Sheriff's Department attempted to serve the warrant on June 7, the warrant was not served until June 27, 2001.[2]

Later that day, Ms. Thomas went to the Citizens Dispute office, completed some paper work about the incident, and was eventually interviewed. Ms. Thomas was then taken to the judicial commissioner to obtain an order of protection. She was also referred to the domestic violence unit of the police department for a warrant for aggravated assault. The *ex parte* order of protection was granted. A hearing was scheduled on the matter for June 21, 2001. The *ex parte* order was never served on the respondent, David Ivy. The order noted that attempts were made on June 15, 19, and

---

[1]Subsequent to her death, David Ivy was charged in indictment number 01-12223 with aggravated assault of Ms. Thomas based upon this conduct.

[2]Ms. Thomas contacted the Sheriff's Department on the morning of June 8th and provided the Sheriff's Department with an alternate address for David Ivy. She indicated that Appellant may be found at "an address on Meda."

20. The order further noted: "After diligent search and inquiry the Appellant is not found in my county."

Two days later, on June 8th, Officer Cummings again encountered Ms. Thomas. However, this time, Ms. Thomas was "outside her apartment building in the parking lot." "She was pronounced dead."

Deborah Kelley, Ms. Thomas' cousin, testified that Ms. Thomas lived in the Magnolia Place Apartments on Millbranch. She explained that her sister, Jackie Bland, lived in the Millbranch Park apartments. Ms. Kelley knew David Ivy as Ms. Thomas' boyfriend. The couple dated for almost a year. At some point, Ms. Thomas attempted to end her relationship with David Ivy. Although Ms. Thomas had moved out of the house they shared, Ms. Kelley remarked that the couple "would always end up talking back together." Ms. Kelley stated that Lakisha Thomas eventually moved into the Magnolia Place Apartments off Millbranch.

Ms. Kelley related an incident that occurred at her home about a month before Ms. Thomas' murder, during which Appellant Ivy had grabbed Ms. Thomas by her hair. Ms. Kelley told Ivy, "Uh-huh, don't do that. Let her go. You've got to get out of here with that." Appellant Ivy retorted, "I told you about playing with me, bitch." He then left.

A few days prior to Ms. Thomas' murder, Ms. Kelley arrived at her sister's apartment where she found Ms. Thomas, sitting at the kitchen table wearing sunglasses. Ms. Thomas had blood on her shirt. Jackie Bland stated, "Look what Day Day did to Kisha." Ms. Thomas then removed her sunglasses, revealing a black eye. She remarked that her shoulder was hurting and that "she thinks she had a hole in her head." Ms. Thomas explained that David Ivy had "caught her at Mapco . . . and jumped on her, hit her in the head with a pistol." Ms. Kelley testified that Ms. Thomas was nervous and scared, scared that Appellant Ivy was "trying to kill her." Jackie Bland then contacted the police. Ms. Kelley later drove Ms. Thomas to Eastwood Hospital on Getwell. Several hours later, Ms. Kelley accompanied Ms. Thomas to 201 Poplar to "swear out a warrant [for Ivy's] arrest." On the way to the police station, Ms. Thomas indicated to Ms. Kelley that Appellant Ivy was following them. Ms. Kelley pulled the vehicle into an Exxon parking lot and called the police. However, by the time the police arrived, Appellant Ivy was gone. The three then continued to the Shelby County Criminal Justice Center located at 201 Poplar.

After leaving 201 Poplar, the three women drove to Joe's Liquor Store on Poplar Avenue . While inside the liquor store, Ms. Kelley observed Appellant Ivy. She requested that someone "[c]all the police." In response, two men in the store went to the front door. Ms. Kelley stated that the Appellant then walked back around the liquor store building. When Ms. Kelley returned to the vehicle, Ms. Thomas stated, "Girl, he said he going to kill me. He's been following me all day." Ms. Thomas added that "He told me if I put the police in his business he was going to fuck me up." Terrance Hibler, an employee at the liquor store, overheard Appellant Ivy ask Ms. Thomas if she hated him, that "it wasn't over," and that "[h]e was going to get her." The women then waited for the police to arrive to escort them back to 201 Poplar. After the incident, Terrance Hibler observed

that Ms. Thomas "was shaking real bad and crying and saying, 'I know he's going to kill me. I know he's going to get me.'"

Frank Sullivan, an employee of Joe's Wines and Liquor, confirmed the events occurring at the liquor store. He specifically recalled speaking with Ms. Thomas. He stated that "[s]he was very afraid." He noticed that she was "bruised pretty badly." She informed him that she had just filed a charge for assault against "Day Day." Mr. Sullivan testified that Ms. Thomas had the name Day Day tattooed on her neck. She stated that "he had beaten her up." Mr. Sullivan "remember[ed] distinctly [Ms. Thomas] saying, 'I'm afraid he's going to kill me.'" The surveillance cameras of the liquor store videotaped the Appellant outside the liquor store on June 6, 2001.

On the morning of June 8th, 2001, Ms. Kelley, accompanied by Jackie Bland, Ms. Thomas, Andrea and Jackie's baby, were preparing to leave Jackie Bland's house. The plan was to drive Ms. Thomas and Ms. Bland to the beauty shop; then Ms. Kelley would take the vehicle "to be tuned up because [they] had planned on leaving and going out of town." That morning, the police contacted Ms. Thomas, indicating that they could not locate Appellant Ivy at the address she had provided. While Ms. Kelley finished getting ready in the house, Ms. Thomas and Andrea had already gotten into the car. Ms. Bland, holding her eight-month-old child, was waiting outside the door for Ms. Kelley. At this time, Ms. Bland "[saw] somebody run up and . . . opened fire. . ." into the front passenger side of the vehicle where Ms. Thomas was seated. The assailant was wearing a black hat, sunglasses and had a towel over his mouth. Although the assailant's face was covered, Ms. Bland testified that the assailant resembled David Ivy in appearance. Ms. Kelley, still in the residence, "heard one shot and Jackie came screaming and running in the house. And after that Andrea come screaming and running in the house. Everybody was just screaming. Jackie said, 'Call the police. Day Day shot Kisha." Ms. Kelley then "heard tires . . . like somebody was getting away fast out in the parking lot." Andrea confirmed that it was Day Day that shot Kisha. Ms. Hunt related that the assailant pulled the towel from over his face, revealing himself as David Ivy. She also stated that, before firing three shots, David Ivy smiled and remarked, "Oh, bitch, you want me dead, huh?" After calling 911, Ms. Kelley went out into the parking lot where she found Ms. Thomas "[s]lumped over in the car seat . . . with her arm in a sling. . . ." Ms. Kelley raised Ms. Thomas' body and "saw the bullet hole. . . ."

Gregory Kelley, Bland and Kelley's brother, worked as a maintenance supervisor at the Millbranch Apartments. Upon hearing the gunshots, Gregory Kelley ran in that direction. As he approached, he heard people "hollering," "[s]omebody just got shot in that car, that green car." Gregory Kelley recognized the car as belonging to his cousin Lakisha Thomas. Upon reaching his cousin's body, he noticed two wounds, one to her chest and one to her side. Gregory Kelley pulled her lifeless body out of the car onto the pavement. He then attempted to apply pressure to the wounds while shouting for someone to call 911. Gregory Kelley never saw the assailant; he just saw a "white car speed up out of the apartments." He testified that the car resembled the car owned by David Ivy.

Jackie Bland and Andrea Hunt further related instances of conflict in David Ivy and Lakisha Thomas' relationship. Ms. Bland recalled an incident where she observed David Ivy pull a "plug" "out of [Ms. Thomas'] head." She also recalled an incident that occurred about one month prior to Ms. Thomas' murder. Ms. Thomas called Ms. Bland, telling her that Appellant Ivy had broken all the tables in the house; he had kicked the door in; and she was "fixing" to call the police. Ms. Bland also commented that Ms. Thomas had often stated that "she was tired [of fighting with him] and she was ready to leave [Appellant Ivy] alone but she was scared." Ms. Hunt confirmed Appellant Ivy's physical abuse of Ms. Thomas. Ms. Hunt further stated that Ms. Thomas would comment that Appellant Ivy "had her on 23 and 1. She could only come out an hour a day. That was to take her kids to school and pick them up from school."

Memphis Police Officer Alvin Clark stated that in May 2001 he responded to a disturbance call at 3725 Millbranch. Lakisha Thomas informed Officer Clark that her boyfriend, David Ivy, "had forced his way into her apartment and was moving the belongings out of her apartment." Ms. Thomas further advised Officer Clark that David Ivy had "stated that he was going to kill her." Officer Clark observed that Lakisha Thomas was "nervous and shaking." She informed the officers at the scene that David Ivy "was stalking her and was constantly making threats to her to harm her and he was upset because she ended their relationship." Officer Clark related that Ms. Thomas' grip on his arm lasted so long and was so firm that "she had embedded some fingerprints in [his] arm." He commented that "it was obvious that she was very shaken up and afraid."

The next time Officer Clark saw Lakisha Thomas was on June 8, 2001, after she had been murdered. Officer Clark and his partner were flagged down by a maintenance worker at the Millbranch Apartments. Upon reaching the body, Officer Clark was unable to detect a pulse from the victim's body. The officer then began interviewing witnesses. During this time, Officer Clark observed a white vehicle pull out of the complex at a high rate of speed.

An investigation of the crime scene revealed the presence of spent casings and bullet fragments as well as several live rounds. An examination of the casings and bullets led a TBI forensic scientist to conclude that this evidence was consistent with a scenario in which a semi-automatic nine millimeter weapon was fired with some of the bullets passing through a body, some bullets being fired and leaving an empty shell casing, and some bullets not firing but being manually ejected from the weapon.

Appellant Ivy was arrested on June 27, 2001, in Tipton County, Tennessee. He was transported back to Memphis. On May 16, 2002, Appellant Ivy escaped from the Shelby County Jail. Appellant Ivy was eventually located in San Diego, California.

Tommy Westbrooks was the Appellant's parole officer in February 2001. Appellant Ivy was placed on parole in June of 2000, with parole status scheduled to terminate in the year 2020.

Dr. O'Brien Clary Smith, the medical examiner for Shelby County, performed an autopsy on the body of Lakisha Thomas. The postmortem examination of the body revealed the presence of

"multiple gunshot wounds," a total of five wounds of entrance to the right side of the body. "The path of those wounds went . . . from the right side of her body over to the left and had an upward course . . . as they progressed from right to left." Exit wounds were located on the left side of the body, one in the front of the left shoulder, two behind the left shoulder, one of the left side of the abdomen and one on the left side. Powder burns were located on the victim's right upper arm. He explained that powder burns are

> small puncture wounds produced in the skin surface when particles of burned and unburned gun powder are projected from the bale of a weapon at a distance close enough for them to have enough energy to actually embed themselves in the skin. And for most handguns this is out to a range of about two feet.

He also noticed "stipple type powder burns on the side of her right arm." Dr. Smith added that there was also a gunshot wound to the victim's left arm. Dr. Smith verified that bruising located on the victim's person would have been consistent with the victim sustaining the "trauma or assault that had occurred on June the 6th."

Dr. Smith was unable to determine the sequence of the gunshot wounds. Nonetheless, he provided the following description of the gunshot wounds inflicted upon Lakisha Thomas. Gunshot wound A is an exit wound. Gunshot wound B entered the victim's body on the right lateral chest. The bullet fractured a rib, pierced the right lung, and damaged the right atrium of the heart. This bullet also damaged the pulmonary artery and pierced the left lung before exiting the body beneath the left shoulder. Gunshot wound C entered at the right side of the chest. This bullet pierced the right lung and the heart; it also bruised the upper lobe of the left lung and fractured the second rib before exiting on the front side of the shoulder (gunshot wound A). Gunshot wound G entered at the back of the victim's left upper arm. Dr. Smith described this wound as a re-entrance wound, *i.e.*, one of the bullets that exited her body re-entered due to the position of the victim's arm. Gunshot wound H entered the victim's body at her right upper back. This bullet "hit[] the spine at the 7th thoracic vertebra. . . " and damaged the spinal cord. This bullet continued to damage the left upper lobe of the lung and fractured the back of the second rib. Next, gunshot wound I entered at the right upper buttock. This bullet bruised the intestines and the pancreas; it produced a grazing wound to the liver, and left kidney; the bullet then fractured the tenth rib. This bullet did not exit; rather, it lodged itself between the skin and the left tenth rib. The final gunshot wound of entrance is gunshot wound J. This bullet entered on the right upper outer thigh. This bullet damaged the uterus and the fallopian tube. It also "produce[d] two holes in the lower portion of the colon or large bowel" and produced two injuries to the small bowel. The bullet then exited on the left side of the abdomen.

Dr. Smith confirmed that the course of the gunshot wounds through the victim's body was consistent with the victim "balling up in a fetal like position." He further confirmed that the victim was no more than two feet from the weapon when it was discharged. Of the victim's vital internal organs, the spleen was the only organ not affected by the gunshots. Thus, Dr. Smith concluded that the victim's death was the result of the multiple gunshot wounds; two bullets striking the victim's heart would have ended "her life the quickest."

Appellant Ivy did not testify, rather, he presented the testimony of one witness, Vickie Crawford. Ms. Crawford testified that Appellant Ivy was the father of her daughter born on April 10, 2001. She stated that she and Appellant Ivy lived together both before and after the birth of their daughter. Ms. Crawford explained that she, Ms. Thomas, and Appellant Ivy all grew up in the same neighborhood. Ms. Thomas lived near Ms. Crawford, and their children went to school together. Ms. Crawford learned that Appellant Ivy was "seeing" Ms. Thomas in October 2000. She stated that there was no indication that Thomas and the Appellant were having a difficult time in their relationship. The last time she saw Ms. Thomas was around 3:00 a.m. on June 6, 2001, when she appeared at her residence.

Following the proof in the case, the jury returned with a verdict finding Appellant Ivy guilty of first-degree premeditated murder.

### *Penalty Phase Evidence*

The State presented the testimony of Elaine Thomas, the victim's sister. Elaine Thomas related that Lakisha was the oldest of six children. Lakisha Thomas was survived by four children all under ten years of age, Federika Wilson, Takisha Wilson, Capria Wilson and Robin Johnson. Since Ms. Thomas' murder, the four children are now separated. Not only has the children's living arrangement changed, but their school work and social activities have suffered greatly.

Elaine Thomas stated that her sister, Lakisha, was the "backbone of the family" and that she had no enemies. Her murder affected the lives of everyone in their immediate family. Lakisha's mother, particularly, has been seriously impacted by her daughter's death.

The State also presented the testimony of Joe Warren, a criminal court clerk, to introduce Appellant Ivy's five prior felony convictions. The clerk's files indicated the Appellant was previously convicted upon his guilty pleas to the crimes of especially aggravated robbery, second degree murder, and three counts of aggravated assault.

Ruby Ivy, the Appellant's oldest sister, stated that her brother was born on January 15, 1972. There were nine children in their family, four girls and five boys. Ms. Ivy testified that their mother is a diabetic and is now on a kidney machine. Their mother first began receiving dialysis when Appellant Ivy was fourteen years old. Because of their mother's health problems, Ruby Ivy assumed primary responsibility in raising David, ten years her junior.

Ruby Ivy described her brother, David, as a shy child. She explained, "they would chase him home from school every day, the children, because he wouldn't fight back." David Ivy stopped going to school in the 9th grade. Ruby Ivy then expressed her feelings about her brother:

> . . .I love him sure enough, but David can get along with anybody. . . . David is a good guy. He's got a good personality. He's very understandable. He loves children. Like I say, he can get along with anybody. He's got a talent which he can sing. He can play any kind of instrument. . . . .

Ms. Ivy implored the jury not to sentence her brother to death.

-7-

On cross-examination, Ruby Ivy conceded that she was aware of her brother's 1993 convictions for second degree murder, especially aggravated robbery, and three counts of aggravated assault. She also admitted knowledge of her brother's 1992 conviction for escape, his 1993 conviction for possession of cocaine with intent to sell, and his 1991 misdemeanor conviction for possession of a controlled substance.

Gladys Hobson was a neighbor of the Ivy family when they lived in the Orange Mound area. Ms. Hobson testified that David Ivy and her son were friends. When asked to speak to the jury regarding the sentencing verdict, Ms. Hobson stated "I think that life and death should be decided from the Father above. I don't think it should be decided by man."

William Fletcher lived next-door to Appellant Ivy when Ivy was living at 859 Henley. He recalled that David Ivy moved into the residence with a young woman Ivy referred to as "Little Mama." Fletcher knew her as Kisha. The couple lived in this house for about five or six months. Fletcher testified that David Ivy "was a pretty nice kid. He always respected me, called me sir." Fletcher was unable to state whether or not Appellant Ivy was employed, stating that "whenever I came in he was either babysitting or he was working on the house."

Kim Mackey, an acquaintance of both Lakisha Thomas and David Ivy, stated that they lived in the same neighborhood when Lakisha and David were growing up. Ms. Mackey's daughter was the same age as Lakisha and David. Ms. Mackey also expressed her belief that "life and death are [not] in our hands."

Vickie Crawford, the mother of the Appellant's child, testified that she went to school with the Appellant and Lakisha Thomas and that they were all friends. Ms. Crawford stated that she and the Appellant maintained their relationship despite his going to prison for second degree murder. She remained in contact with him during his six years in prison and after his release. Ms. Crawford and David Ivy had a child together in April 2001, and she intends to keep in contact with Appellant Ivy if he should be sentenced to a life sentence. Ms. Crawford further testified that David's absence from her household has affected her two sons. She asked the jury to spare David Ivy's life so that their daughter would have the opportunity to get to know her father.

At the close of the proof, the jury was instructed on the following statutory aggravating circumstances:

> One, that the defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to the person. The State is relying upon the crimes of murder in the second degree, especially aggravated robbery and aggravated assault which are felonies, the statutory elements of which involve the use of violence to the person. Two, the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another.

*See generally* Tenn. Code Ann. § 39-13-204(i)(2), (i)(6).

The jury was also instructed that it should consider:

> Mitigating Circumstances.   Tennessee law provides that in arriving at the punishment, the jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence which shall include but are not limited to the following.  Any testimony that the defendant was 29 years of age at the time of the offense.  Any testimony that his education was limited to education to the 9th grade.  Any testimony that he has a daughter not quite 2 years old.  Any other mitigating factor which was raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing.  That is you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.  No distinction shall be made between the mitigating circumstances listed and those otherwise raised by the evidence.  . . .

Following submission of the instructions, the jury retired to consider the verdict at 2:30 p.m. At 8:50 p.m., the jury returned its verdict, finding that the State had proven the aggravating circumstances (i)(2), the defendant was previously convicted of one or more violent felonies other than the present charge, and  (i)(6), the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another.  The jury further found that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.  In accordance with their verdicts, the jury sentenced the Appellant to death for the premeditated murder of Lakisha Thomas.

## I.  Sufficiency of the Evidence

Appellant alleges that the evidence of his identity as the perpetrator is insufficient under the *Jackson v. Virginia* standard.  In support of this argument, Appellant states that "only one eyewitness was able to identify Appellant as the person who shot and killed Lakisha Thomas."  That person was Andrea Hunt, who testified that the Appellant was the shooter, wore a black hat, did not wear sunglasses, and covered his face with a towel.  He asserts that the testimony of Jackie Bland contradicted Hunt's testimony in that Ms. Bland stated that the shooter wore sunglasses.  The Appellant contends that the testimony regarding the sunglasses is critical as Andrea Hunt testified that a large part of her identification came from looking at the man's eyes.  The Appellant maintains that this contradiction in conjunction with Bland's statements that the shooter was of the same height and build of the Appellant and the testimony of Gregory Kelley that he saw the Appellant's car leave the apartment complex immediately following the shooting although he could not identify the occupant created a reasonable doubt as to the Appellant's identity as the shooter.

When a challenge is made on appeal to the sufficiency of the convicting evidence, this Court is guided by certain well-established principles.  First, a  jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal,

a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *See generally State v. Adkins,* 786 S.W.2d 642, 646 (Tenn. 1990); *State v. Burlison,* 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Instead, the defendant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes,* 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied,* 513 U.S. 1086, 115 S. Ct. 743 (1995); Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris,* 839 S.W.2d 54, 75 (Tenn. 1992), *cert. denied*, 507 U.S. 954, 113 S. Ct. 1368 (1993). In *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App.), *perm. to appeal denied,* (Tenn. 1990), this Court held these rules applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.

With regard to the conflicts in the testimony of the eyewitnesses, the State responds that the law is well-settled. Specifically, the State contends that the credibility of witnesses is a matter for determination by the jury and should not be second-guessed by this Court on appeal. Additionally, the State asserts that the proof overwhelmingly establishes the identity of the Appellant as the victim's assassin.

The State must prove beyond a reasonable doubt that the accused is the person who committed the offense. *See White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975), *perm. to appeal denied*, (Tenn. 1976). Identity of the accused may be accomplished by either direct or circumstantial evidence, or both. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury after a consideration of all competent evidence. *See Biggers v. State*, 219 Tenn. 553, 411 S.W.2d 696, 697 (Tenn. 1967), *aff'd on other grounds by*, 390 U.S. 404, 88 S. Ct. 979 (1968); *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451 (Tenn. 1958); *State v. Crawford*, 635 S.W.2d 704 (Tenn. Crim. App. 1982). Likewise, the determination of whether all reasonable theories are excluded by the circumstantial evidence presented is primarily a question of fact for the jury. *Pruitt v. State*, 3 Tenn. Crim. App. 256, 460 S.W2d 385 (Tenn. Crim. App. 1970).

Appellant Ivy and the victim Lakisha Thomas had been involved in a romantic relationship for approximately one year. Lakisha Thomas was attempting to end her relationship with the Appellant. Two days before Thomas' murder, the Appellant assaulted Thomas with a pistol, resulting in bruising and stitches. A police report of the incident was filed, and Lakisha Thomas sought a restraining order against the Appellant. That same day, the Appellant threatened Thomas, telling her that he would "fuck [her] up" if she "put the police in his business." Numerous witnesses

testified to the abuse Lakisha Thomas endured at the hands of the Appellant and her obvious fear of the Appellant. Two eyewitnesses to the shooting identified the Appellant as the shooter. Indeed, Andrea Hunt who was in the back seat of the vehicle as the Appellant approached Thomas with the weapon stated that there was no doubt that the Appellant was the person who killed Lakisha Thomas.

This Court does not resolve questions involving the credibility of witnesses or the weight and value to be given the evidence. *See State v. Nash,* 104 S.W.3d 495, 500 (Tenn. 2003). Those are matters entrusted to the trier of fact, not the appellate courts. *See id.* Additionally, with consideration of the eyewitness identification, the discord between the victim and the Appellant, and their volatile relationship, we conclude that there was more than ample evidence from which a rational juror could have determined that the Appellant was the perpetrator of Ms. Thomas' murder. Accordingly, we conclude that the Appellant's challenge is not well-taken.

Moreover, we conclude that the proof is more than sufficient to sustain a conviction for first-degree murder. The Appellant was convicted of premeditated first-degree murder. First-degree murder is "the premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2000). Section 39-13-202(d), Tennessee Code Annotated, defines premeditation as:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The element of premeditation is a question of fact to be resolved by the jury and may be established by proof of the circumstances surrounding the killing. *State v. Suttles*, 30 S.W.3d 252, 260 (Tenn.), *cert. denied*, 531 U.S. 967, 121 S. Ct. 401 (2000). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the killer's conduct in light of the surrounding circumstances. Although there is no strict standard governing what constitutes proof of premeditation, circumstances from which a jury may infer premeditation include planning activity by a defendant prior to the killing; the defendant's prior relationship with the victim; and the manner of the killing. *State v. Hall*, 958 S.W.2d 679, 704 (Tenn. 1997); *see also State v. Jones*, 15 S.W.3d 880, 889 (Tenn. Crim. App. 1999); *State v. Schafer*, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995); *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993). Thus, for example, our supreme court has held that premeditation may be inferred from a defendant's use of a deadly weapon upon an unarmed victim; the cruelty of the killing; declarations by a defendant of an intent to kill; the defendant's procurement of a weapon; a defendant's preparations prior to a killing for concealment of the crime; and calmness immediately after the killing. *State v. Pike*, 978

-11-

S.W.2d 904, 914 (Tenn. 1998); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997), *cert. denied*, 523 U.S. 1083, 118 S. Ct. 1536 (1998).

Applying these factors, there are numerous circumstances from which the jury could conclude that the murder was premeditated, *i.e.,* (1) the victim was unarmed, (2) the Appellant ambushed the unsuspecting victim in her automobile, (3) the Appellant secured a weapon prior to the murder and made an effort to conceal his identity, (4) the murder weapon was never located, (5) the killing was especially cruel, and (6) the Appellant had previously made threats against the victim. Viewing the evidence and inferences therefrom in a light most favorable to the State, this Court finds sufficient evidence to support the jury's finding of premeditation. This issue is without merit.

## II. Forfeiture of Wrongdoing Hearsay Exception

During the Appellant's trial, the State relied upon hearsay statements made by the victim to law enforcement officers, relatives and other individuals to establish its case against the Appellant. Prior to trial, defense counsel filed a motion in limine asking the trial court to determine whether hearsay statements made by the victim prior to her death would be admissible during the trial under an exception to the hearsay rule.

At the motion hearing, the State argued as its authority Tennessee Rule of Evidence 804(B)(6), the forfeiture by wrongdoing exception, for introduction of the hearsay statements. The prosecution's theory of the case being that the Appellant, while on parole, committed an aggravated assault on his ex-girlfriend, and then murdered her to prevent her from testifying against him in the prosecution of the aggravated assault and or in a possible parole revocation proceeding based on the aggravated assault. The defense argued that the forfeiture by wrongdoing exception was inapplicable and its use in the present case was bootstrapping. The trial court made the following findings of fact and conclusions of law:

> . . .But as to this issue I do think that any incidents of domestic violence and/or aggravated assault that occurred close in time to this murder that directly involved the victim in this case . . ., *i.e.*, statement of the victim made to somebody else or statement or conduct observed by someone else in the presence of the victim . . . would be relevant to show – relevant and admissible to show the motive of the killing and to sort of set the – paint an accurate picture of the hostility that might have existed in this relationship by the defendant toward the victim and what his intent would have been during the course of this relationship. And I think the case law is supportive of admitting that type of proof. I think that the hearsay exception that was cited is also applicable. That is 804(b)(6). . . . A statement offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness. As a witness to what? You would think

ordinarily that proof of the defendant's actions that would procure the unavailability of the victim in this case as a witness say to the aggravated assault would be the true reading of this exception. Following the State's theory, he really wasn't taking these actions to prevent her from being a witness in this murder case obviously. It would have been to prevent her from being a witness at the parole violation hearing and/or aggravated assault trial that might have come about.

. . .

. . . But one of the things if it were appropriate to apply this hearsay exception to those instances, then the greater harm would be to kill her and have this murder case resulting. So it would not be logical to say that it would apply to the lesser but not the greater. So it would apply also. But to me at least the more compelling rationale would be admitting it to show motive of the killing and to give an accurate and true portrayal to the jury of the type of relationship that existed and the intent that the defendant might have had in taking the actions that he took.

The trial court limited the prosecution to introducing three specific acts of prior violence: (1) an incident during which the victim's hair was pulled out by the Appellant; (2) an incident that occurred when the Appellant was moving out of the victim's apartment and the police were called; and (3) the events of June 6, 2001.

Appellant Ivy contends that the trial court abused its discretion by admitting the victim's hearsay statements under Rule 804(b)(6), Tennessee Rules of Evidence. Specifically, he argues that the trial court incorrectly interpreted and misapplied the forfeiture-by-wrongdoing exception, which permitted the introduction of multiple instances of inadmissible evidence. The Appellant concludes that the trial court's ruling resulted in an infringement of his constitutional rights to confrontation.

Questions concerning the admissibility of evidence are within the sound discretion of the trial court, and a trial court's ruling on evidence will only be disturbed upon a clear showing of abuse of discretion. *See State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004)(citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). A trial court's exercise of discretion will not be reversed on appeal unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Robinson*, 146 S.W.3d at 490 (citing *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement.

Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong. Thus, if a witness' silence is procured by the defendant himself, whether by chicanery, *United States v. Mayes*, 512 F.2d 637, 648-51 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S. Ct. 2629 (1975), by threats, *United States v. Balano*, 618 F.2d 624, 628-29 (10th Cir. 1979), *cert. denied*, (449 U.S. 840, 101 S. Ct. 118

(1980), or by actual violence or murder, *United States v. Thevis*, 665 F.2d 616, 630-31 (5th Cir.), *cert. denied sub nom,* the defendant cannot then assert his confrontation clause rights in order to prevent prior statements of that witness from being admitted against him. Any other result would mock the very system of justice the confrontation clause was designed to protect.

*United States v. Mastrangelo*, 693 F.2d 269, 272-73 (2nd Cir. 1982), *cert. denied*, 467 U.S. 1204, 104 S. Ct. 2385 (1984). Rule 804(b)(6), Tennessee Rules of Evidence, incorporates this common law principle of waiver by misconduct. *See* Tenn. R. Evid. 804 (b)(6).

Under Rule 804(b)(6), Tennessee Rules of Evidence, a party forfeits any hearsay objection to the out-of-court statement of an unavailable witness where the party's own misconduct causes the witness's unavailability.[3] *Cf. Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S. Ct. 330, 332 (1934) (privilege to confront one's accusers and cross-examine them may be lost by consent or at times even by misconduct). This hearsay exception only applies when a party's wrongdoing is done with the intention of making the declarant unavailable to testify as a witness. *See* 30B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 7078. The provision is an attempt to curtail the problem of witness intimidation. *Id.* Thus, if a party's wrongdoing was for another purpose, *e.g.*, killing the declarant based upon personal animosity, the exception does not apply.

The prosecution argued that because the Appellant murdered Ms. Thomas to prevent her from testifying against the Appellant in the aggravated assault case and/or parole revocation hearing, her statements are admissible in his trial for her murder under this exception. The Appellant concedes that the statements would be admissible in proceedings regarding the aggravated assault of June 6 or parole revocation proceedings. However, he asserts that the "forfeiture by wrongdoing" exception allows for the admission of witness statements in a proceeding if the witness was murdered to prevent him or her from testifying in that same proceeding. *See United States v. Johnson*, 219 F.3d 349, 356 (4th Cir.), *cert. denied*, 531 U.S. 1024, 121 S. Ct. 593 (2000). Thus, for example, if the Appellant murdered Ms. Thomas to prevent her from testifying at a parole revocation hearing, Ms. Thomas' statements would be admissible in the parole revocation hearing. Appellant continues to assert that the rule is not intended to permit the wholesale introduction of hearsay statements made by a murder victim against a defendant in the murder trial simply because the parties were involved in or about to be involved in other litigation at the time of the alleged murder. *See United States v. Lentz*, No. 02-19, 58 Fed. Appx. 961, 2003 WL 253949 (4th Cir. Feb. 6, 2003) (Traxler, J., concurring). In essence, the Appellant argues that the "forfeiture by wrongdoing" exception is to be generally limited to the introduction of hearsay statements in the proceeding at which the deceased was expected by the accused to testify.

---

[3]Rule 804(b)(6), Tennessee Rules of Evidence, provides: "A statement offered against a party that has engaged in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness."

Prior to admitting hearsay statements under the forfeiture-by-wrongdoing exception, the trial court must hold an evidentiary hearing outside the presence of the jury during which the offering party has the burden of establishing, by a preponderance of the evidence:

> (1) the defendant, or party against whom the out-of -court statement is offered, was involved in, or responsible for, procuring the unavailability of the declarant through knowledge, complicity, planning or in any other way, *see United States v. Miller*, 116 F.3d 641, 668 (2nd Cir. 1997), *cert. denied*, 524 U.S. 905, 118 S. Ct. 2063 (1998); and

> (2) the defendant, or party against whom the out-of-court statement is offered, acted with the intent of procuring the declarant's unavailability as an actual or potential witness, *see* Tenn. R. Evid. 804(b)(6).

*See also United States v. Dhinsa*, 243 F.3d 635, 653-654 (2nd Cir. 2001). Absent prior directives mandating the above-stated principles, the trial court conducted a Rule 403, Tennessee Rule of Evidence, analysis. The trial court found that the Appellant murdered the victim to prevent her from being a witness at the parole violation hearing and/or aggravated assault trial that "might have come about."

We cannot conclude that the proof established by a preponderance of the evidence that the Appellant acted with the intent to procure the victim's unavailability as a witness. First, we would note that the record is absent sufficient proof establishing that the Appellant was even aware that a warrant for his arrest had been issued regarding the June 6 aggravated assault incident. Rather, the record reflects that, although issued on June 7, 2001, the warrant was not served until June 27, 2001, nineteen days after the victim's murder. Additionally, although the Appellant was on parole at the time of both the June 6th incident and the victim's June 8th murder, there is no evidence that a parole revocation proceeding had been initiated. Thus, any finding that the Appellant murdered the victim to prevent her from testifying against him at a future proceeding yet to be scheduled is at best speculative. As much as the proof indicated that the Appellant's intent was to prevent Ms. Thomas from testifying against him, *e.g.*, "he wasn't going back to jail" and "he told me if I put the police in his business he was going to fuck me up," there was also evidence that Ms. Thomas had endured the Appellant's abusive behavior throughout the existence of their relationship. To conclude that the murder was committed for the purpose of preventing Ms. Thomas from testifying at <u>potential</u> future proceedings would expand the Rule beyond the scope of its intended purpose. Moreover, it is conceivable that such a broad application of the Rule would lead to wide-spread abuse by parties seeking admission of out-of-court statements of an unavailable declarant. Accordingly, we conclude that the trial court abused its discretion in admitting hearsay statements under the forfeiture-by-wrongdoing exception.

Accordingly, we must determine whether such error was harmless. Before proceeding with our review, we are compelled to note the Appellant has failed to specifically identify the statements

at issue. Thus, we are left to discern which statements are challenged. After a laborious examination of the record, we focus upon the following hearsay statements of Ms. Thomas:

"said that he wasn't going back to jail. Then after she called the police in reference to the assault that he would come back and kill her."

"Girl, he said he going to kill me. He's been following me all day. He told me if I put the police in his business he was going to fuck me up."

"I know he's going to kill me. I know he's going to get me."

"I'm afraid he's going to kill me."

These statements are likewise inadmissible under the state-of-mind hearsay exception. This exception to the hearsay rule can only be used to show the declarant's conduct. Tenn. R. Evid. 803(3). A third party's conduct, *i.e.*, the Appellant's conduct in the present case, may not be established by the unavailable declarant's statements. *See State v. Long*, 45 S.W.3d 611, 623 (Tenn. Crim. App. 2000); Advisory Comm'n Comments, Tenn. R. Evid. 803(3).

Additionally, although the victim's fear of the defendant may be admitted under this exception, it may only be admitted if relevant to a fact at issue in the case. *See State v. Leming,* 3 S.W.3d 7, 18 (Tenn. Crim. App. 1998); *State v. John Parker Roe,* No. 02C01-9702-CR-00054, 1998 WL 7107 (Tenn. Crim. App. at Jackson, Jan. 12, 1998), *perm. to appeal denied,* (Tenn. at Jackson, Jan. 4, 1999), *cert. denied*, 526 U.S. 1159, 119 S. Ct. 2049 (1999). For example, our supreme court has held that statements made by a victim expressing her fear of the defendant during the period of their separation could be admitted to rebut the defendant's assertions that he and the victim were reconciling. *See State v. Smith,* 868 S.W.2d 561, 573 (Tenn. 1993), *cert. denied*, 513 U.S. 960, 115 S. Ct. 417 (1994). Similarly, this Court has held that a victim's statement that her husband had abused her and threatened to kill her was admissible to rebut the defendant's assertion that he and the victim "had a good marriage and a happy marriage." *See Roe,* slip op. at 18-21. Here, the fact that the victim and the Appellant had a volatile relationship is not disputed. The victim's fear of the Appellant is not disputed. The introduction of the victim's statements invited speculation and not rational inferences and should have been excluded.

Notwithstanding the error in the admission of the victim's statements, any such error is harmless. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). First, the State presented the testimony of two eyewitnesses to the murder of Lakisha Thomas. Andrea Hunt was seated behind Ms. Thomas in the vehicle as the Appellant shot Ms. Thomas multiple times. Ms. Hunt stated that the Appellant pulled off his mask, smiled, and said "Oh, bitch, you want me dead, huh?" before

firing three shots at the victim. Jackie Bland, who was waiting outside her apartment, saw "somebody run up and . . .open[] fire" into the front passenger side of the vehicle where Ms. Thomas was seated. Ms. Bland testified that, despite the fact that she was unable to see the perpetrator's face, the assailant resembled David Ivy in appearance. The maintenance supervisor of the apartment complex observed a white car resembling the car driven by Appellant speed out of the apartment complex. The evidence of the prior acts of violence of the Appellant upon the victim, *i.e.*, evidence of the June 6, 2001, assault and evidence of the hair-pulling incident, was properly admitted by the trial court to establish the Appellant's intent and identity. Tenn. R. Evid. R 404(b); N. Cohen *et al.,* Tennessee Law of Evidence § 404.6 (3d ed.1995). Moreover, as the Appellant concedes, the statements made by Lakisha Thomas on June 6, 2001, at Joe's Liquor Store, although inadmissible under the forfeiture-of-wrongdoing exception, were admissible as an excited utterance. *See* Tenn. R. Evid. 803(2). Irrespective of any error, the proof overwhelmingly establishes the identity of the Appellant as the person who murdered the victim. Finding the error harmless, the Appellant is not entitled to relief on this issue.

### III. Anonymous Jury

Prior to the start of the trial, the State requested that an anonymous jury be impaneled. As basis for the request, the State related that, after the Appellant's preliminary hearing, "one of the witnesses has had an attempt on her life. Her baby ended up getting shot." The State had charged a relative and former co-defendant of the Appellant with the shooting. Additionally, the State asserted that this shooting, combined with the fact that the Appellant had twice escaped from confinement, supported the impaneling of an anonymous jury. In response to the State's request, the trial court made the following findings:

> . . .Obviously [the jury] will be sequestered. No jury questionnaires were requested or filled out in this case. Well, first I'll state that we've selected anonymous juries in several cases that have been tried in Division 5 in the past. And in each instance any objection to that procedure has not resulted in a reversal. I know that there have been a couple of cases in middle Tennessee in which anonymous juries have been selected. . . . And so it's a procedure that has been employed in the state. Obviously it's not a procedure that should be used without reason because there is I think some risk of prejudice to the defendant when you do employ an anonymous jury. I think it may heighten the level of concern that jurors might have just by virtue of the fact that they're being chosen in an anonymous manner. But you have to weigh that against the heightened level of concern and fear they may have if they aren't anonymous which has always been the reason for choosing an anonymous jury in the past when there has been testimony of gang involvement or particularly violent events that may lead jurors to fear for their safety or the safety of their families and that sort of thing. And in this case as I understand it, the concern is not so much for the jurors hearing about gang involvement . . . as it is our knowledge outside of the

-17-

jurors' presence of some of the actions that have allegedly occurred in relation to this case. First and foremost the alleged motive for this murder to have occurred to begin with and that is to keep the victim of this murder from testifying against this defendant and thereby sending him back to prison. And then the alleged act by the relative of this defendant. . . . That resulted in an indictment that's now pending in this division of court that is an act that was allegedly perpetrated against a witness in this case. . . .

. . .

I don't think that it's a stretch to say that it's reasonable to be concerned for the safety of these jurors. These are citizens who are volunteering their time. . . . And to further place them in danger or their families in danger or potentially place them in danger would simply not be very responsible on the part of the system. And so any steps that can be taken to assure the safety of the jurors should be taken in my opinion. And while there is always the argument that there's some prejudice in relation to the defendant when you choose an anonymous jury, if the circumstances warrant then anonymous jurors have been approved on many occasions in the past in this state and other states. So in this case given the circumstances that we have I think that we will select an anonymous jury. And as far as I'm concerned . . . an anonymous jury for today is an anonymous jury forever. . . .

The Appellant now contends that the trial court committed reversible error by impaneling an anonymous jury. Specifically, he contends that the impaneling of an anonymous jury violated his rights under the Constitutions of the United States and the State of Tennessee. In this regard, the Appellant and the State both agree that no Tennessee appellate court has specifically addressed the propriety of an anonymous jury. *See, e.g.*, *Carruthers v. State*, 145 S.W.3d 85, 89 (Tenn. Crim. App. 2003) (trial court impaneled anonymous jury but issue not raised on appeal). The Appellant avers that the impaneling of an anonymous jury is a "drastic measure" which violates the right to trial by jury as guaranteed by the Tennessee and United States Constitutions. Additionally, he asserts that the impaneling of an anonymous jury is in direct conflict with Tennessee statutes and court rules. Rule 24(c), Tennessee Rules of Criminal Procedure, provides that each peremptory challenge is to be made using the "name" of the challenged prospective juror. Finally, Rule 24(g), Tennessee Rules of Criminal Procedure, provides that defense counsel is to be furnished with a list of prospective jurors that includes the "name" of each member of the jury panel.

An anonymous jury is a concept unknown at common law. *See* William D. Bremer, Annotation, *Propriety of Anonymous Juries*, 60 A.L.R. 5th 39, 46 (1998). Indeed, the empaneling of an anonymous jury is a relatively recent phenomenon that was rarely utilized. A jury is typically deemed "anonymous" when juror information is withheld from the public and the parties themselves for the safety of the jurors or to prevent harassment by the public. *See State v. Tucker*, 657 N.W.2d 374, 379 (Wis. 2003) (emphasis deleted) (citation omitted); *see also People v. Williams*, 616 N.W.2d 710, 712 (Mich. App. 2000) (citation omitted). The concept of anonymous juries has been primarily

the creation of the federal courts, which have decided that whether to impanel an anonymous jury depends upon several factors, including whether defendants were alleged to have engaged in dangerous and unscrupulous conduct, whether defendants had engaged in past attempts to interfere with the judicial process, and whether there had been a substantial degree of pretrial publicity. Bremer, *supra* at 47. Use of anonymous juries in state courts is viewed as an extraordinary measure warranted only under certain circumstances. In Tennessee, the propriety of the use of an "anonymous jury" is an issue of first impression.

Tennessee law does not specifically authorize the use of anonymous juries. Section 40-18-104, Tennessee Code Annotated, provides:

> The names of the jurors are written on separate scrolls, and placed in a box or other receptacle, and drawn out by . . . the judge, or some person agreed upon by the district attorney general and the defendant.

Rule 24, Tennessee Rules of Criminal Procedure, further provides that a peremptory challenge is to be made using "the name of any juror" and that defense counsel is to be furnished, upon request, a list of members of the jury panel, containing the "name, address, occupation, name of spouse, occupation of spouse" of each prospective juror. Tenn. R. Crim. P. 24(c), (g). In addition to these provisions, the impaneling of an anonymous jury may compromise (1) the presumption of innocence and (2) a criminal defendant's right to an impartial jury by preventing a defendant from adequately exploring possible biases of potential jurors. *See* William D. Bremer, Annotation, *Propriety of Anonymous Juries*, 60 A.L.R. 5th at 52-54. "An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence." *United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994), *cert. denied*, 515 U.S. 1132, 115 S. Ct. 2558 (1995)). Additionally, ". . . juror anonymity denies a defendant information that might be helpful in the exercise of his or her right to utilize peremptory challenges during voir dire." *United States v. Edmond*, 52 F.3d 1080, 1090 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 988, 116 S. Ct. 539 (1995).

These rights, however, may be forfeited through a defendant's actions when those actions demonstrate that an anonymous jury is necessary to protect the integrity of the jury's decision making process. *See Edmond*, 52 F.3d at 1090-94; *Ross*, 33 F.3d at 1519-22; *United States v. Crockett*, 979 F.2d 1204, 1214-17 (7th Cir. 1992), *cert. denied*, 507 U.S. 998, 113 S. Ct. 1617 (1993); *United States v. Scarfo*, 850 F.2d 1015, 1021-26 (3rd Cir. 1988), *cert. denied*, 488 U.S. 910, 109 S. Ct. 263 (1988); *United States v. Barnes*, 604 F.2d 121, 140-141 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S. Ct. 1833 (1980). In the same regard as a defendant may voluntarily forfeit his right to confront a witness through his acts of witness intimidation, *see People v. Watts*, 661 N.Y.S.2d 768, 771 (1997), and may forfeit his right to be present at his own trial through his disruptive behavior, *id.*, similarly, the right to the knowledge of jurors' names and addresses may be forfeited by a defendant's acts warranting such a result. *Id*. Thus, in cases where there are strong or

compelling reasons to believe that the jury needs protection, a court may find that a criminal defendant has forfeited his statutory right to knowledge of jurors' names and may impanel an anonymous jury. Notwithstanding, the court should take reasonable precautions to minimize any prejudicial effects on the defendant. *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991), *cert. denied*, 505 U.S. 1220, 112 S. Ct. 3029 (1992).

Although Tennessee has not adopted guidelines for impaneling an anonymous jury, we can benefit from those guidelines adopted by the Sixth Circuit to determine when circumstances of a case call for the use of an anonymous jury. *See United States v. Talley*, 164 F.3d 989, 1001-1002 (6th Cir.), *cert. denied*, 526 U.S. 1137, 119 S. Ct. 1793 (1999). The Sixth Circuit followed the lead of its sister courts in developing protocol for the impaneling of an anonymous jury. In so doing, the Sixth Circuit noted that the court should not order the impaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant to ensure that his fundamental rights are protected. *Talley*, 164 F.3d at 1001 (citing *Paccione*, 949 F.2d at 1192). Thus, an anonymous jury may be appropriate in cases (1) with very dangerous persons who were participants in large scale organized crime, and who participated in mob-style killing and had previously attempted to interfere with the judicial process; (2) where defendants have had a history of attempted jury tampering and serious criminal records; or (3) where there have been allegations of dangerous and unscrupulous conduct by the defendant, coupled with extensive pretrial publicity. *Talley*, 164 F.3d at 1001 (citing *Paccione*, 949 F.2d at 1192). The court must further ensure that the defendant retains his or her right to an unbiased jury by conducting "a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself," and by providing the jury a neutral and non-prejudicial reason for requiring that it be anonymous, so that jurors will refrain from inferring that anonymity was necessary due to the character of the defendant. *Talley*, 164 F.3d at 1001-1002 (citing *Paccione*, 949 F.2d at 1192). Within these parameters, the decision of whether to empanel an anonymous jury is left to the discretion of the trial court. *See Paccione*, 949 F.2d at 1192.

1. *Did the trial court have a strong reason to believe that the jury needed protection?*

The trial court determined that there was strong reason to believe that the jury needed protection. Specifically, the trial court found that the motive behind the murder was to prevent a witness from testifying against the Appellant and that, prior to trial, a relative of the Appellant was charged in a shooting incident involving one of the State's witnesses in this case. The trial court determined that "participants in the [legal] system [must] be allowed to participate without fear of any sort of recrimination or anything happening to them."

Sufficient reason for empaneling an anonymous jury has been found to exist upon a showing of some combination of several factors, including:

(1) the defendant's involvement in organized crime;

(2) the defendant's participation in a group with the capacity to harm jurors;

(3) the defendant's past attempts to interfere with judicial process;

(4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties; and

(5) extensive publicity that could enhance the possibility the jurors' names would become public and expose them to intimidation or harassment.

*Ross*, 33 F.3d at 1520. Three of these five factors are applicable to the present case. Factor (2) is applicable as the Appellant's relative was the perpetrator of the attempted shooting of a State witness prior to trial. Factor (3) is applicable as the Appellant's expressed motive underlying the murder was to prevent his parole from being revoked. Factor (4) is definitely implicated as the punishment sought and ultimately imposed was the death penalty. Therefore, with respect to the first element of the two-part test, the trial court reasonably concluded that there was strong reason to believe the jury, the witnesses and others involved needed the protection of the anonymous jury.

*2. Did the trial court take reasonable precautions to minimize any prejudicial effects on the Appellant and to ensure that his fundamental rights were protected?*

Reasonable precautions must be taken to minimize any prejudicial effect on the defendant and to ensure that his fundamental rights are protected. This is generally accomplished by (1) ensuring that defense counsel has substantial information about the prospective jurors to conduct meaningful voir dire; and (2) providing the jury with a precautionary instruction that gives the jurors a plausible and non-prejudicial reason for not disclosing their identities. *See State v. Samonte*, 928 P.2d 1, 15-17 (Haw. 1996).

In the present case, the trial court permitted extensive voir dire to expose potential bias. The only limitations on voir dire of the prospective jurors were (1) they were identified by number and (2) counsel could not inquire as to the location of the prospective jurors' employment. Jurors were questioned as to their occupation, prior jury service, religious beliefs regarding the death penalty, prior experiences as crime victims, legal education, gun ownership, and children. The only information kept from the parties were the names and addresses of the potential jurors. We conclude that the Appellant was able to intelligently exercise peremptory challenges and conduct a thorough voir dire.

The trial court, however, failed to provide the jury with a precautionary instruction. Notwithstanding, the failure to provide such an instruction does not, per se, imply that the trial court's action infringed upon a defendant's right to the presumption of innocence. *See Samonte*, 928 P.2d at 17 (citing *United States v. Vario*, 943 F.2d 236, 241 (2nd Cir. 1991)). In *United States v.*

*Vario*, the Second Circuit held that "[a]lthough the district court . . . did not instruct the jury in order to explain their anonymity, there is no reason to believe that the absence of instructions led the jurors to conclude other than it is a common practice to keep jurors' names and identities in confidence." 943 F.2d at 241.

Considering the totality of the circumstances, we conclude that the trial court took reasonable steps to minimize any prejudicial effects that the impaneled anonymous jury might have had on the Appellant and to protect the Appellant's fundamental rights.

### *3. Conclusion*

The trial court did not abuse its discretion by concluding that there was strong reason to believe that the jury, the witnesses, and the prosecution needed the protection of an anonymous jury. We further conclude that the trial court took reasonable precautions to minimize any prejudicial effects on the Appellant and to ensure that his fundamental rights were protected. Thus, the trial court did not lose, destroy or sacrifice the Appellant's constitutional right to a presumption of innocence and an impartial jury by impaneling an anonymous jury. Under these circumstances, the trial court's order granting the prosecution's motion for jury anonymity is affirmed.

## IV. Exclusion of "Rationale of Hearsay Exclusion" From Closing Argument at Guilt Phase

During closing argument of the guilt phase, defense counsel attempted to explain to the jury the "suspect" nature of hearsay testimony. The State objected to this line of argument. The trial court advised counsel that it was not proper argument to "get into a legal explanation of those sorts of things and then have the State come back and respond and go back . . . ." The trial court then sustained the State's objection and instructed defense counsel "to refrain from any sort of history of the hearsay exception." Appellant now contends that the trial court erred in limiting his closing argument by preventing him from discussing the limitations of hearsay evidence.

Closing argument is a valuable privilege for both parties and the trial courts generally allow wide latitude to counsel in arguing their cases to the jury and will only be reversed upon an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001), *cert. denied*, 534 U.S. 1023, 122 S. Ct. 553 (2001); *State v. Bigbee,* 885 S.W.2d 797, 809 (Tenn. 1994) (citations omitted).

It is settled law in this state that "the courts are the proper source from which [the jury is] to get the law." *Dale v. State*, 18 Tenn. 551, 555 (1837). It is the court's duty to charge the law relative to the case and the jury's duty to consider the evidence under the law as given by the court. *See Cordell v. State*, 338 S.W.2d 615, 618 (Tenn. 1960); *see also* Tenn. Const. art. I, sect. 19. It is the function of the trial court, and not that of counsel, to instruct or advise the jury as to matters of

law.  In the present case, the trial court ruled, out of the presence of the jury, that several statements made by the victim fell within valid exceptions to the hearsay rule and were sufficiently reliable to warrant admission.  For defense counsel to argue that hearsay statements are "inherently unreliable" and "easily manufactured" would essentially undermine the rulings of the trial court.  Moreover, it is conceivable that statements regarding the nature of hearsay testimony had the potential to confuse the jury.  Accordingly, the trial court did not abuse its discretion in prohibiting defense counsel from discussing the basic principles and theories regarding the general exclusion of hearsay testimony.  No abuse of discretion is found.

## V.  Exclusion of "Residual Doubt" From Closing Argument at Penalty Phase

During opening argument of the penalty phase, defense counsel stated to the jury that "if you had any *residual doubt* about his guilt for the first phase, you found him guilty beyond a reasonable doubt, but if you had any residual doubt you can use that as well."  Later, the trial court, out of the presence of the jury, informed defense counsel that it was not "appropriate to argue lingering doubt or residual doubt to the jury."  The trial court also advised that "residual doubt" would be stricken from the Appellant's list of mitigating circumstances.  The trial court revisited the issue, stating:

> Let me briefly state something regarding residual doubt.  I think I might have overstated my position a little bit earlier.  I've now reviewed a few cases on that issue.  The most recent case apparently is State v. H[a]rtman . . . .  And there are a lot of other cases as well. . . .  But all of them . . . seem to suggest that proof regarding residual doubt may be appropriate in instances where the State has concealed exculpatory evidence that the defense somehow finds out about later or the defense on [its] own uncovers additional proof that may shed some light on the defendant's involvement in the offense. . . .  In my opinion[,] these cases clearly state that the argument of residual doubt is not intended to allow the defense to argue at sentencing to sort of reargue the case that was presented at the guilt phase to sort of go over all of the - - - for example, all of the inconsistencies that exist in the guilt phase and say not to look back at these and isn't there still some residual doubt in your minds, aren't you still troubled by these inconsistencies, doesn't that constitute sufficient lingering doubt.  I don't think that it's intended to allow for that. . . . [E]ven Teague . . .talks about the defendant's argument that he be entitled to present at the sentencing hearing any additional – any exculpatory evidence which the State was aware of and that sort of thing.  So it talks about the affirmative presentation at the sentencing hearing of something additional that perhaps was unknown at the time of the guilt phase or couldn't be delved into at the time of the guilt phase or somehow the defense was precluded from presenting it at guilt phase and now can present it for the jury's consideration as "residual doubt." . . . [T]o just generally talk about residual doubt with nothing more specific I'm still going to preclude you from doing that and I'll not[e] your exception.

The trial court concluded that "residual doubt" would be stricken from the jury instructions and it would not be instructed as a non-statutory mitigating factor. On appeal, Appellant Ivy contends that the trial court erred in preventing him from arguing "residual doubt" as a non-statutory mitigating circumstance during closing argument.

Our supreme court has held that "a defendant is allowed 'to present evidence at a re-sentencing hearing to establish residual doubt as a nonstatutory mitigating circumstance.'" *State v. McKinney*, 74 S.W.3d 291, 307 (Tenn.), *cert. denied*, 537 U.S. 926, 123 S. Ct. 321 (2002) (citing *State v. Hartman*, 42 S.W.3d 44, 55-56 (Tenn. 2001)); *see also State v. Holton*, 126 S.W.3d 845, 861 (Tenn.), *cert. denied*, – U.S. –, 125 S. Ct. 62 (2004). Later, in *State v. McKinney*, 74 S.W.3d at 307, the high court held that "'residual doubt evidence,' in general, may consist of proof admitted during the sentencing phase that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase." (citing *Hartman*, 42 S.W.3d at 55-56); *see also Holton*, 126 S.W.3d at 861. Cases prior to *State v. McKinney* involved cases where the defendant actually sought to introduce evidence during the penalty phase to establish residual doubt. *See, e.g.*, *Hartman*, 42 S.W.3d at 55 (defendant sought to introduce evidence that prosecutor had purchased testimony of key witness)**;** *State v. Teague*, 897 S.W.2d 248, 256 (Tenn. 1995) (defendant sought to introduce alibi evidence during sentencing phase).

As in the present case, Defendant McKinney only sought to argue evidence that had already been admitted by the trial court and heard by the same jury in the guilt phase of the trial. *McKinney*, 74 S.W.3d at 307. That is, the Appellant, during the guilt phase, relied upon a theory that the Appellant was not the person who shot the victim and that he was misidentified by the eyewitnesses. In *McKinney*, our supreme court held that the trial court erred by refusing to permit the "residual doubt" argument. *Id.* at 308. The court reasoned:

> An argument during sentencing that refers to evidence from the guilt phase is not improper simply because it has the effect of alluding to residual doubt. As we have long held, the manner and conduct of closing argument by the parties is left to the discretion of the trial court. Accordingly, where a defendant seeks to argue residual doubt based on the evidence introduced or in response to an argument made by the prosecution, the trial court should exercise its discretion by resolving any doubt in favor of the defendant's argument.

*Id.* (internal citations omitted). Thus, in the instant case, the trial court erred by prohibiting defense counsel from referring to this evidence in argument before the same jury during the sentencing phase. *See McKinney*, 74 S.W.3d at 308.

We in turn proceed to determine whether this error requires reversal. In *McKinney*, the supreme court applied a harmless error analysis and determined that any error was harmless. *Id.* In reaching this determination, the court reasoned as follows:

(1) argument does not have the same substance or weight of evidence;

(2) this was *not* a re-sentencing hearing, thus, "the reality is that the sentencing jury had already heard the testimony underlying defense counsel's proposed argument and had reconciled it in favor of the State's theory of guilt and against the defendant's theory of innocence. Thus, the argument was of dubious value either as residual doubt or in mitigation;" and

(3) the aggravating circumstance found by the jury was strongly supported by the defendant's prior conviction for aggravated robbery.

*Id.* We conclude that this same rationale applies in the present case. Accordingly, we hold that the Appellant has not shown that the trial court's error affected the jury's verdict to his prejudice; thus, the error is harmless.

## VI. Admission of Prior Charge of First Degree Murder

During the penalty phase, the State sought to prove aggravating circumstance (i)(2) that the defendant had previously been convicted of crimes whose statutory elements involved violence. *See* Tenn. Code Ann. § 39-13-204(i)(2). In support of this claim, the State introduced evidence of the Appellant's prior convictions for second degree murder, especially aggravated robbery and three counts of aggravated assault. In establishing the Appellant's conviction for second degree murder, the prosecutor asked the courtroom clerk to read the indictment in case number 91-02330. The clerk stated that indictment 91-02330 charged the Appellant with murder in the perpetration of a felony and first-degree murder. He continued to read for the jury the indictment:

Upon their oath present that David Ivy also known as Terry Turner and Eric B. Bowden on December 21st, 1990, in Shelby County, Tennessee, and before the finding of this indictment did unlawfully kill Reginald J. Parnell during the perpetration of a robbery in violation of TCA 39-13-202 against the peace and dignity of the state of Tennessee, signed John Pierotti, district attorney general, 30th judicial district.

. . .

Upon their oath present that David Ivy also known as Terry Turner and Eric B. Bowden on December 21st, 1990, in Shelby County, Tennessee, and before the finding of this indictment did unlawfully, intentionally, deliberately and with premeditation kill Reginald J. Parnell in violation of TCA 39-13-202 against the peace and dignity of the state of Tennessee, signed John Pierotti, district attorney general, 30th judicial district.

The clerk then testified that the Appellant entered a guilty plea to second degree murder. The indictment was introduced as an exhibit to the proceeding. The clerk's testimony was entered without objection.

The Appellant now complains that the fact that he was indicted for first degree murder is both highly irrelevant and highly prejudicial. Appellant submits that the fact that he was indicted for first degree murder proves nothing. However, the fact that he was charged with first degree murder places an inference before the jury that he had previously committed a first degree murder and had escaped punishment for the same by pleading to a lesser offense. The State contends that the Appellant has waived this issue by failing to lodge a contemporaneous objection. Alternatively, the State contends that the trial court did not err by permitting the indictments to be read to the jury.

Although the State's position as to waiver is well-taken, we elect to review this issue due to the severity of the sentence imposed in this matter. *See, e.g., McKinney,* 74 S.W.3d at 291. In *State v. Sims*, our supreme court approved a procedure in which the trial judge, outside the presence of the jury, considers the underlying facts of the prior offense to determine whether the elements of those offenses involved the use of violence to the person. *State v. Sims*, 45 S.W.3d 1, 11-12 (Tenn.), *cert. denied*, 534 U.S. 956, 122 S. Ct. 357 (2001). Accordingly, introduction of the indictment was not necessary to establish the aggravating circumstance. Thus, for this purpose the indictment was irrelevant. Notwithstanding subsection (c), Tennessee Code Annotated section 39-13-204, provides, in part:

> . . . In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party. Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor. . . .

Accordingly, while we believe that the better practice favors exclusion of the indictment and reference to the indicted offense from the evidence, the State's introduction of the alternative count indictments in this case was not prejudicial to the Appellant as the State was entitled to introduce the facts and circumstances of the homicide. The Appellant is not entitled to relief on this issue.

## VII. Instruction as to (i)(2) Aggravator

Our supreme court has recognized that some felony offenses, specifically aggravated assault, do not necessarily involve the use of violence. *State v. Powers*, 101 S.W.3d 383, 400 (Tenn.), *cert. denied,* 538 U.S. 1038, 123 S. Ct. 2083 ( 2003); *Sims*, 45 S.W.3d 11-12. Thus, in *Sims*, our supreme court approved a procedure in which the trial judge, outside the presence of the jury, considers the underlying facts of the prior assault to determine whether the elements of those offenses involved the use of violence to the person. *Powers*, 101 S.W.3d at 400; *Sims*, 45 S.W.3d at 11-12. If the trial court determines that the statutory elements of the prior offense involved the use of violence , the State may introduce evidence that the defendant had previously been convicted of the prior offenses. *Powers*, 101 S.W.3d at 400-401. The trial court then would instruct the jury that those convictions involved the use of violence to the person. *Id.*

Prior to the start of the penalty phase, the trial court, out of the presence of the jury, conducted a hearing to determine whether the prior convictions of the Appellant, relied upon by the State to establish the (i)(2) aggravator, involved violence to the person. The trial court determined that the offenses of second degree murder and especially aggravated robbery, under any definition of these offenses, would involve violence to the person. As to the Appellant's three convictions for aggravated assault, the State conceded that there are two ways of committing the offense of aggravated assault, one resulting in serious bodily injury to a person and the other by use of a weapon. In case number 91-02560, the indictment alternatively alleged both means of committing the offense, however, the Appellant pled guilty to count one which charged "serious bodily injury." The trial court found that the indictment "sufficiently alleges violence that's required to use it as an aggravator."[4] As to the two remaining counts of aggravated assault, case numbers 90-09886 and 90-09887, the charges involved two separate victims. The indictments in these cases alleged aggravated assault by reckless use of a deadly weapon causing the victim to reasonably fear bodily injury. In each of these cases, the facts state that the Appellant, armed with a shotgun, shot into the back door of two residences, after arguing with a woman. No one was injured as a result of the incident. Both residences were occupied by children. The trial court found that in these two cases, 90-09886 and 90-09887, the underlying facts of these offenses "constitute[] violence under the law."

Appellant Ivy now submits to this Court that the question of whether prior crimes involved violence is a question for the jury to resolve beyond a reasonable doubt and not a question for the court to resolve by a preponderance of the evidence. Appellant argues that the requirement that the trial court make the determination that the prior felony conviction was an offense involving violence to the person violates the dictates of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000) and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428 (2002). The State responds, with support from decisions of other jurisdictions, that *Sims* does not violate the dictates of *Apprendi*.

---

[4]The underlying affidavit alleged that the Appellant "shot [the victim Andrew Ewing] in front of 2840 Arlington on November 8, 1990, at approximately 3:00 p.m."

A panel of this Court recently addressed this identical issue in *State v. Detrick Cole*, No. W2002-01254-CCA-R3-DD, 2003 WL 22848969, at \*14-16 (Tenn. Crim. App. at Jackson, Nov. 24, 2003). Appeal of this issue is currently pending before the Tennessee Supreme Court. *See State v. Detrick Cole*, No. W2002-01254-SC-DDT-DD (Tenn. Apr. 30, 2004) (order) (oral argument heard Nov. 10, 2004). The court in *Cole* acknowledged both the dictates of our supreme court established in *State v. Sims* and the implications of the United States Supreme Court's decision in *Ring v. Arizona*. After a thorough review of the applicable law, this Court noted several areas left undecided by the United States Supreme Court. Additionally, this Court, in light of the *Ring* decision, questioned whether Tennessee has a blanket exemption from the right to trial by jury requirements of *Apprendi* and *Ring* based solely on the fact that we have jury sentencing in capital cases.[5]  *State v. Detrick Cole*, No. W2002-01254-CCA-R3-DD, 2003 WL 22848969, at \*14-16.

After evaluating the implications of *Ring* and *Apprendi* as applied to the (i)(2) aggravating circumstance, this Court in *Cole* concluded:

> . . . *Apprendi* requires that any "*fact*" which increased the penalty beyond the prescribed statutory maximum, "*other than the fact of a prior conviction,*" must be submitted to a jury and found beyond a reasonable doubt. 530 U.S. at 490 (emphasis added). Further, *Ring* dictates that the death penalty is a penalty beyond the prescribed statutory maximum. 536 U.S. at 603-604. In regard to Tennessee's prior violent felony aggravating circumstance, *Sims* authorizes the examination of the underlying *facts* in order to determine whether the prior felonies were or were not, in fact, *violent*. 45 S.W.3d at 11-12. When a trial judge examines the underlying facts, factually determines that a prior offense involved violence, and then, based upon its finding of fact, instructs the jury as a matter of law that the prior violent felony involved violence, it is arguable that this usurps the role of the jury as trier of fact. Therefore, it is arguable the procedure outlined in *Sims* may well be in violation of *Ring*.

*State v. Detrick Cole*, No. W2002-01254-CCA-R3-DD, 2003 WL 22848969, at \*15. Acknowledging that the automatic review of capital cases by the Tennessee Supreme Court, *see* Tenn. Code Ann. § 39-13-206(a)(1), pretermitted the necessity of determining whether the procedure set forth in *Sims* violates the holding of *Ring,* this Court concluded that the error incurred as a result of following the *Sims* procedure, if error at all, was harmless in light of the fact that the jury was presented with evidence underlying the defendant's prior convictions. *Id.*

---

[5]Our supreme court affirmed its decision in *Dellinger* on January 5, 2004. *See State v. Holton*, 126 S.W.3d 845 (Tenn. 2004). However, the supreme court was not presented with the issue regarding the apparent conflict between the *Sims* decision and *Ring* and, thus, is not dispositive of the issue before this Court.

Notwithstanding the dictum of *Cole*, our review of this issue does not compel the finding that *Sims* violates the dictates of *Apprendi*. Introduction of proof supporting the (i)(2) factor at the sentencing phase first requires a determination of whether the statutory elements of the prior crime involved violence. This threshold determination, which requires an element comparison test, is clearly a question of law for the court, not a question of fact as contemplated by *Apprendi*. Indeed, submitting this question to the jury as a question of fact without instruction, or in terms which would make the jury the final arbiter of a legal question would itself be error. This position would also most likely result in disparate findings by different juries in capital cases with regard to which crimes are violent and which are not. Numerous jurisdictions, in post-*Apprendi* decisions, have approved the procedure of assigning to the trial judge the task of finding not only the mere fact of previous convictions but also other related issues as well, including the aggravated nature of the conviction. *See, e.g.*, *United States v. Becerra-Garcia*, 28 Fed. Appx. 381, 385 (6th Cir. 2002) (*Apprendi*'s reservation as to the prior conviction exception encompasses determinations regarding the nature or character of the prior offense, thus, trial court properly determined that prior conviction was for an aggravated felony); *United States v. Santiago*, 268 F.3d 151, 156 (2nd Cir. 2001) (trial court assigned task of determining whether prior convictions arose from offenses committed on different occasions); *Stallworth v. State*, 868 So.2d 1128, 1185 (Ala. Crim. App. 2001) (concluding that trial judge may determine whether a defendant was under a sentence of imprisonment when he committed the capital offense), *cert. denied*, 868 So.2d 1189 (Ala. 2003), *cert. denied*, – U.S. –, 124 S. Ct. 828 (2003); *Jones v. State*, 855 So.2d 611, 619 (Fla. 2003) (denying claim based on *Ring v. Arizona* where the aggravating circumstances the jury found included a prior violent felony); *Belcher v. State*, 851 So.2d 678, 685 (Fla. 2003) (concluding *Ring* did not disturb the holding in *Apprendi*, which exempted prior convictions from facts required to be submitted to a jury), *cert. docketed*, No. 03-6522 (U.S. Sept. 23, 2003); *State v. Stewart*, 791 A.2d 143, 151-52 (Md. 2002) (recidivism is question traditionally reserved for sentencing court, thus, trial court may make determinations beyond fact of prior conviction); *State v. Williams*, 97 S.W.3d 462, 474 (Mo.), (holding that a trial judge may determine as a matter of law whether a defendant's prior conviction involved "serious assaultive behavior" as an element of an aggravating circumstance), *cert. denied*, 539 U.S. 944, 123 S. Ct. 2607 (2003).

In the instant case, the trial court followed the mandates of *Sims*. Finding that this procedure complies with the mandates of *Apprendi* and *Ring*, no error is found. This issue is without merit.

### VIII. Indictment Failed to Charge Capital Offense

Appellant Ivy asserts that "[a]ny fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt in order to satisfy the 5th Amendment's Due Process Clause and the 6th Amendment's notice and jury trial guarantees." (citing *Jones v. United States*, 526 U.S. 227, 243 (1999)). In this regard, Appellant contends that the indictment against him failed to "include the facts that would qualify the [Appellant] for the death penalty." Appellant's argument is based upon the premise that first-degree murder is not a capital offense unless accompanied by aggravating factors. Essentially, Appellant

complains that the indictment returned by the grand jury charges non-capital first-degree murder because the grand jury did not find any capital aggravating circumstances. Thus, it appears to this Court that Appellant alleges that to satisfy the requirements of *Apprendi v. New Jersey*, 530 U.S. at 466, 120 S. Ct. at 2348, the indictment must include language of the statutory aggravating circumstances to elevate the offense to capital murder. This argument has recently been rejected by our supreme court in *Holton*, 126 S.W.3d at 845. In *Holton*, our high court explained that "*Apprendi* applies only to enhancement factors used to impose a sentence above the statutory maximum" and that "the death penalty is within the statutory range of punishment prescribed for first degree murder by the Tennessee General Assembly. . . ." *Holton*, 126 S.W.3d at 863 (*citing State v. Dellinger*, 79 S.W.3d 458, 466-67 (Tenn. 2002)); *see also State v. Odom*, 139 S.W.3d 572 (Tenn. 2004). The court further emphasized that "Tennessee's capital sentencing procedures require that a jury, not a judge, make the findings regarding the presence of aggravating circumstances and that the findings must be made beyond a reasonable doubt." *Odom*, 139 S.W.3d at 590-91 (citing *Holton*, 126 S.W.3d at 864; *see also* Tenn. Code Ann. § 39-13-204(f)(1)(2003)). Appellant Ivy is not entitled to relief on this issue.

## IX. Question as to Unanimous Verdict

After three hours of deliberations, the jury submitted several questions to the trial court. The questions were as follows:

> 1. Re-identifying mitigating circumstances. What will happen if we can't come to an agreement?

> 2. What is mitigating?

> 3. Are we to weigh the testimony, mitigating and aggravating, that was given to determine a guilty verdict now in the sentencing phase? and

> 4. And are we to weigh the facts from the entire trial to form our opinion for the sentence?

In response to the question "What will happen if we can't come to an agreement?" the trial court reread portions of the jury charge, including

> Tennessee law provides that no sentence of death or sentence of imprisonment shall be imposed by a jury but upon unanimous finding that the State has proved beyond a reasonable doubt the existence of one or more statutory aggravating circumstances.

The jury resumed their deliberations, and, three hours later reached its verdict imposing a sentence of death. The Appellant now submits that the trial court erred in failing to give the jury accurate sentencing information as to the consequence of their failure to reach a verdict. He argues that the trial court's failure to properly respond to the jury's question "gives rise to a reasonable probability of a coerced verdict." Contemporaneously, he asks this Court to find section 39-13-204(h), Tennessee Code Annotated, unconstitutional in the context of the present case.

The trial court adhered to legislative direction in its instruction to the jury. *See* Tenn. Code Ann. § 39-13-204(f)(1), (2); -204(g)(1). The trial court further respected the legislature's admonition contained in section 39-13-204(h), Tennessee Code Annotated, "The judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on the effect of the jury's failure to agree on a punishment." In this regard, we cannot conclude that the trial court erred by refusing to ignore legislative directive.

The Appellant also attacks the failure to fully inform the jury as to the consequences if the jury fails to reach a unanimous verdict as unconstitutional. Relying upon the Sixth, Eight, and Fourteenth Amendments, Appellant argues that by permitting jurors to remain ignorant of the true consequence of their failure to reach a unanimous verdict is misleading and coercive and it causes the jury to arbitrarily arrive at a unanimous verdict in order to avoid the imagined adverse consequences of a failure to agree on punishment. This argument has been previously rejected by our supreme court. *See State v. Stevens*, 78 S.W.3d 817, 850 (Tenn. 2002), *cert. denied*, 537 U.S. 1115, 123 S. Ct. 873 (2003); *State v. Vann,* 976 S.W.2d 93, 118 (Tenn. 1998); *State v. Smith,* 893 S.W.2d 908, 926 (Tenn. 1994). Thus, we find no error.

## X. Constitutionality of Tennessee Death Penalty Scheme

The Appellant raises numerous challenges to the constitutionality of Tennessee's death penalty provisions, including:

> 1. Tennessee's death penalty statutes fail to meaningfully narrow the class of death eligible defendants, specifically, the statutory aggravating circumstances set forth in Tennessee Code Annotated section 39-2-203(i)(2), (i)(5), (i)(6), and (i)(7) have been so broadly interpreted whether viewed singly or collectively, fail to provide such a "meaningful basis" for narrowing the population of those convicted of first degree murder to those eligible for the sentence of death. We note that factors, (i)(5) and (7), do not pertain to this case as it was neither relied upon by the State nor found by the jury. Thus, any individual claim with respect to these factors is without merit. *See, e.g.*, *State v. Hall*, 958 S.W.2d 679, 715 (Tenn. 1997), *cert. denied*, 524 U.S. 941, 118 S. Ct. 2358 (1998); *State v. Brimmer,* 876 S.W.2d 75, 87 (Tenn.), *cert. denied*, 513 U.S. 1020, 115 S. Ct. 585 (1994). Moreover, the Appellant's argument has been rejected by our supreme court. See *Vann*, 976 S.W.2d at

117-118(Appendix); *State v. Keen*, 926 S.W.2d 727, 742 (Tenn. 1994), *cert. denied*, 532 U.S. 907, 121 S. Ct. 1233 (2001).

2. The death sentence is imposed capriciously and arbitrarily in that

(a) Unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected. *See State v. Hines*, 919 S.W.2d 573, 582 (Tenn.1995), *cert. denied*, 519 U.S. 847, 117 S. Ct. 133 (1996).

(b) The death penalty is imposed in a discriminatory manner based upon race, geography, and gender. This argument has been rejected. *See Hines*, 919 S.W.2d at 582; *Brimmer*, 876 S.W.2d at 87; *Cazes*, 875 S.W.2d at 268; *State v. Smith*, 857 S.W.2d 1, 23 (Tenn.), *cert. denied*, 510 U.S. 996, 114 S. Ct. 561 (1993).

(c) Requiring the jury to agree unanimously to a life verdict violates *Mills v. Maryland* and *McKoy v. North Carolina*. This argument has been rejected. *See Brimmer*, 876 S.W.2d at 87; *State v. Thompson*, 768 S.W.2d 239, 250 (Tenn. 1989); *State v. King*, 718 S.W.2d 241, 249 (Tenn. 1986), *superseded by statute as recognized by*, *State v. Hutchinson*, 898 S.W.2d 161 (Tenn. 1994).

(d) There is a reasonable likelihood that jurors believe they must unanimously agree as to the existence of mitigating circumstances because of the failure to instruct the jury on the meaning and function of mitigating circumstances. This argument has been rejected. *See Thompson*, 768 S.W.2d at251-52.

3. Finally, the Appellant raises challenges to the appellate review process in capital cases. It is well-established that the appellate review process in death penalty cases is constitutionally adequate. *See Cazes*, 875 S.W.2d at 270-71; *Harris*, 839 S.W.2d at 77. Moreover, the supreme court has held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required." *See State v. Bland*, 958 S.W.2d 651, 663 (Tenn. 1997), *cert. denied*, 523 U.S. 1083, 118 S. Ct. 1536 (1998).

## XI.  Sufficiency of the (i)(6) Aggravating Factor

At this juncture, we find it prudent to address an apparent contradiction in our holding. Previously, we concluded that the proof at the guilt phase supporting application of Rule 804(b)(6), Tennessee Rules of Evidence, the forfeiture by wrongdoing hearsay exception, was insufficient to permit introduction of various hearsay statements made by the victim.  The jury, at the sentencing phase, determined that the evidence supported the application of the (i)(6) statutory aggravator, the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant.  In this regard, we acknowledge the inherent similarities between the proof regarding the forfeiture-by-wrongdoing hearsay exception and the (i)(6) aggravator.  The Appellant has not challenged the sufficiency of the proof supporting application of statutory aggravating factor (i)(6), the murder was committed to avoid prosecution. Notwithstanding our conclusion that the proof at the guilt phase failed to establish for purposes of Rule 804(b)(6), Tennessee Rules of Evidence, that the murder was committed to procure the unavailability of the victim, we conclude that the proof at the sentencing phase is sufficient to support the application of the (i)(6) aggravating factor.

To support application of the (i)(6) aggravator, the proof need not show that an arrest warrant had been issued or that legal proceedings had been initiated against the Appellant.  Rather, the proof need only show that the "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant."  Tenn. Code Ann. § 39-13-204(i)(6). This aggravating circumstance may be applied when the proof shows that avoiding arrest was one motivation for the killing.  *See State v. Hartman*, 42 S.W.3d 44, 58 (Tenn. 2001).  On June 6, 2001, the Appellant confronted Lakisha Thomas in front of Joe's Liquor Store, where he told her that "if [she] put the police in his business he was going to fuck [her] up."  This is sufficient proof from which the jury could conclude that one of the motives of the Appellant was to prevent arrest.

## XII.  Review Pursuant to Tenn. Code Ann. § 39-13-206(c)

This Court is required by section 39-13-206(c)(1)(D), Tennessee Code Annotated, and under the mandates of  *State v. Bland*, 958 S.W.2d at 661-674, to consider whether the Appellant's sentence of death is disproportionate to the penalty imposed in similar cases.  *See State v. Godsey*, 60 S.W.3d 759, 781-82 (Tenn. 2001).  The comparative proportionality review is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." *State v. Stout,* 46 S.W.3d 689, 706 (Tenn. 2001) (citing *Bland*, 958 S.W.2d at 662 (quoting *Pulley v. Harris*, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875 (1984)).  If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate."  *Stout*, 46 S.W.3d at 706 (citations omitted).

In conducting our proportionality review, this Court must compare the present case with cases involving similar defendants and similar crimes. *See Stout*, 46 S.W.3d at 706 (citation omitted); *see also Terry*, 46 S.W.3d at 163 (citations omitted). We select only from those cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. *See State v. Carruthers*, 35 S.W.3d 516, 570 (Tenn. 2000), *cert. denied*, 533 U.S. 953, 121 S. Ct. 2600 (2001) (citations omitted); *see also Godsey*, 60 S.W.3d at 783. We begin with the presumption that the sentence of death is proportionate with the crime of first-degree murder. *See Terry*, 46 S.W.3d at 163 (citing *Hall*, 958 S.W.2d at 799). This presumption applies only if the sentencing procedures focus discretion on the "'particularized nature of the crime and the particularized characteristics of the individual defendant.'" *Terry*, 46 S.W.3d at 163 (citing *McCleskey v. Kemp,* 481 U.S. 279, 308, 107 S. Ct. 1756 (1987) (quoting *Gregg v. Georgia*, 428 U.S. 153, 206, 96 S. Ct. 2909 (1976))).

Applying this approach, the Court, in comparing this case to other cases in which the defendants were convicted of the same or similar crimes, looks at the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating factors involved. *See Terry*, 46 S.W.3d at 164. Regarding the circumstances of the crime itself, numerous factors are considered including: (1) the means of death, (2) the manner of death, (3) the motivation for the killing, (4) the place of death, (5) the victim's age, physical condition, and psychological condition, (6) the absence or presence of provocation, (7) the absence or presence of premeditation, (8) the absence or presence of justification, and (9) the injury to and effect on non-decedent victims. *Stout,* 46 S.W.3d at 706 (citing *Bland,* 958 S.W.2d at 667); *see also Terry*, 46 S.W.3d at 164. Contemplated within the review are numerous factors regarding the defendant, including: (1) prior criminal record, (2) age, race, and gender, (3) mental, emotional, and physical condition, (4) role in the murder, (5) cooperation with authorities, (6) level of remorse, (7) knowledge of the victim's helplessness, and (8) potential for rehabilitation. *Stout*, 46 S.W.3d at 706; *Terry,* 46 S.W.3d at 164.

In completing our review, we remain cognizant of the fact that "no two cases involve identical circumstances." *See generally Terry,* 46 S.W.3d at 164. Thus, our function is not to limit our comparison to those cases where a death sentence "is perfectly symmetrical," but rather, our objective is only to "identify and to invalidate the aberrant death sentence." *Terry*, 46 S.W.3d at 164 (citing *Bland,* 958 S.W.2d at 665).

The circumstances surrounding the murder in light of the relevant and comparative factors reveal that the Appellant and Lakisha Thomas had been involved in a romantic relationship. In early June 2001, Lakisha Thomas reported to police officers that the Appellant had assaulted her with a pistol at a Mapco station. Ms. Thomas suffered bruising and required stitches on the top of her head. As a result of the beating, Ms. Thomas procured an order of protection against the Appellant. Later that same day, the Appellant approached Ms. Thomas and warned her that if she "put the police in his business he was going to fuck [her] up." Two days later, Ms. Thomas was preparing to leave town. While sitting in her car waiting for her cousins, the Appellant ran toward her with a gun. Ms. Thomas tried to protect herself by rolling into a ball. The Appellant stated, "Oh bitch, you want me

dead, huh?" He then started laughing and began shooting. Ms. Thomas was shot at least five times. The murder weapon was never located. Appellant Ivy evaded arrest until June 27, 2001, when he was located in Tipton County. Almost one year later, the Appellant escaped from jail and made his way to San Diego, California, where he was eventually recaptured.

The Appellant was previously convicted of second degree murder, especially aggravated robbery, and aggravated assault. The medical examiner testified that all of the close range gun shot wounds would have been fatal. The unsuspecting and unarmed victim was shot after being ambushed by the Appellant. The Appellant was twenty-nine years old at the time of the offense. Friends and family of the Appellant described him as a nice person. The Appellant has one daughter born approximately two months prior to Ms. Thomas' murder.

While no two capital cases and no two capital defendants are alike, we have reviewed the circumstances of the present case with similar first-degree murder cases and conclude that the penalty imposed in the present case is not disproportionate to the penalty imposed in similar cases.

The Appellant has prior convictions for second degree murder, especially aggravated robbery and aggravated assault. The death sentence has been upheld based on the sole aggravating circumstance of a prior violent felony conviction, Tenn. Code Ann. § 39-13-204(i)(2). *See, e.g., McKinney*, 74 S.W.3d at 291(prior conviction for aggravated robbery as adult and aggravated assault as juvenile); *State v. Chalmers,* 28 S.W.3d 913 (Tenn. 2000) (prior convictions for attempted especially aggravated robbery and attempted first degree murder); *State v. Keough*, 18 S.W.3d 175, 183 (Tenn. 2000) (prior convictions for assault to commit voluntary manslaughter and manslaughter); *State v. Smith,* 993 S.W.2d 6 (Tenn. 1999) (prior convictions for robbery and first degree murder); *State v. Boyd,* 959 S.W.2d 557 (Tenn. 1998); *Adkins,* 725 S.W.2d at 660 (prior conviction for aggravated assault). The prior violent felony factor is an aggravating circumstance that this Court has described as "more qualitatively persuasive and objectively reliable than others." *McKinney*, 74 S.W.3d at 313; *Howell,* 868 S.W.2d at 261.

We further acknowledge that the death penalty has been upheld in cases where the same or similar aggravating circumstances were found to outweigh any mitigating circumstances. *See, e.g., State v. Adkins*, 725 S.W.2d 660 (Tenn. 1987) (death sentence upheld based upon (i)(2) and (i)(6), aggravating circumstances); *State v. Teague*, 645 S.W.2d 392 (Tenn. 1983), *on remand*, 680 S.W.2d 785 (Tenn. 1984) (death sentence upheld based upon (i)(2) and (i)(6) aggravating circumstances). Finally, the death penalty has been upheld in cases where the murder of the victim involved domestic violence. *See, e.g.*, *Keough*, 18 S.W.3d at 175 (defendant stabbed estranged wife to death after argument; death penalty affirmed based on (i)(2) aggravating circumstance); *State v. Hall*, 8 S.W.3d 593 (Tenn. 1999) (defendant strangled estranged wife to death after assault on her person; death penalty affirmed based on (i)(5) aggravating circumstance); *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993) (defendant shot estranged wife, slit her throat and stabbed her multiple times; death sentence upheld based upon (i)(5) and (i)(12); *State v. Johnson*, 743 S.W.2d 154 (Tenn. 1987) (defendant

suffocated wife; death penalty affirmed based upon (i)(2) and (i)(5) aggravating circumstances); *State v. Miller*, 674 S.W.2d 279 (Tenn. 1984), *on remand*, 771 S.W.2d 401 (Tenn. 1989) (defendant beat girlfriend to death with fists and fire poker, he then stabbed her numerous times; death penalty upheld under (i)(5) aggravating circumstance).

Particularly, we note that two prior cases are strikingly similar to the facts in the present case. In *State v. Cooper*, the defendant, who was separated from his wife, called his wife's mother and told her he was going to kill his wife. 718 S.W.2d 256 (Tenn. 1986). The following day, the defendant went to his wife's place of employment and told her he was going to kill her. He then left the premises and purchased a shotgun. Later that morning, he returned and, in the presence of her supervisor, told her he was going to kill her. The supervisor contacted the police of this incident. Law enforcement officers advised the wife to take out an arrest warrant against the defendant. Before she could do so, the defendant returned to her workplace and shot her four times. The death sentence was upheld under the (i)(5) aggravating circumstance. In *State v. Teague*, the defendant struck his estranged wife in the head rendering her unconscious and drowned her in the bathtub. 645 S.W.2d at 392. The motive for the killing was to prevent the wife from testifying against him in an upcoming murder trial. The death penalty was affirmed based upon the (i)(2) and (i)(6) aggravating circumstances.

Our review of these cases reveals that the sentence of death imposed upon Appellant is proportionate to the penalty imposed in similar cases. In so concluding, we have considered the entire record and reach the decision that the sentence of death was not imposed arbitrarily, that the evidence supports the finding of the (i)(2) and (i)(6) statutory aggravators, that the evidence supports the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

## XIII. Conclusion

Having fully reviewed the record and the applicable authority, we affirm the Appellant's conviction of first degree murder. Additionally, in accordance with the mandate of section 39-13-206(c)(1), Tennessee Code Annotated, and the principles adopted in prior decisions of the Tennessee Supreme Court, we have considered the entire record in this cause and find the sentence of death was not imposed in any arbitrary fashion, that the evidence supports, as previously discussed, the jury's finding of the statutory aggravating circumstances, and that the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)(C). A comparative proportionality review, considering both "the nature of the crime and the defendant," convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, we affirm the Appellant's sentence of death.

_____

David G. Hayes, Judge

-36-